AO 91 (Rev. 11/11) Criminal Complaint                                    AUSA Jennifer Chang (312) 469-6151

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA

v.

JOEL ANDRADE, also known as "Wedo";
MARIA BRENDA MORA-HERNANDEZ;
RICHARD RUBIO;
ALEXIS ANDRADE;
JEREMY RUSH, also known as "Slim";
DEVONTE JONES;
JOSE NAVARRETE;
JEREMIE REYES-GONZALEZ; and
ALEXIS GUTIERREZ;

CASE NUMBER: 26 CR 42

**UNDER SEAL**



FILED TD
1/28/2026
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## CRIMINAL COMPLAINT

I, George E. Hobbs, the complainant in this case, state that the following is true to the best of my knowledge and belief:

| Code Section & Defendant(s) | Offense Description |
|---|---|
| **Count One:**<br>21 U.S.C. § 846<br><br>**Defendant(s):**<br>JOEL ANDRADE (a.k.a. "Wedo") and<br>MARIA BRENDA MORA-HERNANDEZ | Beginning no later than on or about October 15, 2025, and continuing to on or about January 15, 2026, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, JOEL ANDRADE (a.k.a. "Wedo") and MARIA BRENDA MORA-HERNANDEZ did conspire with each other and with others known and unknown to knowingly and intentionally possess with intent to distribute and distribute a controlled substance, namely, 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of 21 U.S.C. § 841(a)(1); all in violation of 21 U.S.C. § 846. |
| **Count Two:**<br>21 U.S.C. § 841(a)(1)<br><br>**Defendant(s):**<br>JOEL ANDRADE (a.k.a. "Wedo") and<br>DEVONTE JONES | On or about June 5, 2025, at Rosemont, in the Northern District of Illinois, Eastern Division, JOEL ANDRADE (a.k.a. "Wedo") and DEVONTE JONES did knowingly and intentionally distribute a quantity of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of 21 U.S.C. § 841(a)(1). |

| | |
|---|---|
| **Count Three:**<br>21 U.S.C. § 841(a)(1)<br><br>**Defendant(s):**<br>JOEL ANDRADE (a.k.a. "Wedo"),<br>JOSE NAVARRETE, and<br>JEREMIE REYES-GONZALEZ | On or about June 19, 2025, at Rosemont, in the Northern District of Illinois, Eastern Division, JOEL ANDRADE (a.k.a. "Wedo"), JOSE NAVARRETE, and JEREMIE REYES-GONZALEZ did knowingly and intentionally distribute a quantity of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of 21 U.S.C. § 841(a)(1). |
| **Count Four:**<br>21 U.S.C. § 841(a)(1)<br><br>**Defendant(s):**<br>ALEXIS GUTIERREZ | On or about November 14, 2025, at Chicago, in the Northern District of Illinois, Eastern Division, ALEXIS GUTIERREZ did knowingly possess with intent to distribute a quantity of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of 21 U.S.C. § 841(a)(1). |
| **Count Five:**<br>21 U.S.C. § 841(a)(1)<br><br>**Defendant(s):**<br>JOEL ANDRADE (a.k.a. "Wedo"),<br>RICHARD RUBIO, and<br>ALEXIS ANDRADE | On or about November 16, 2025, at Chicago, in the Northern District of Illinois, Eastern Division, JOEL ANDRADE (a.k.a. "Wedo"), RICHARD RUBIO, and ALEXIS ANDRADE did knowingly possess with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of 21 U.S.C. § 841(a)(1). |
| **Count Six:**<br>18 U.S.C. § 924(c)<br><br>**Defendant(s):**<br><br>RICHARD RUBIO, and<br>ALEXIS ANDRADE | On or about November 16, 2025, at Chicago, in the Northern District of Illinois, Eastern Division, RICHARD RUBIO and ALEXIS ANDRADE did knowingly possess a firearm, namely, one Glock 17 9mm semi-automatic pistol, bearing serial number BVSL666, and one semi-automatic 7.62x39mm pistol, bearing no serial number, in furtherance of a drug-trafficking crime for which they may be prosecuted in a court of the United States, namely, possession with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), as charged in Count Five of this Complaint; all in violation of 18 U.S.C. § 924(c). |
| **Count Seven:**<br>21 U.S.C. § 841(a)(1)<br><br>**Defendant(s):**<br>JOEL ANDRADE (a.k.a. "Wedo") and<br>JEREMY RUSH (a.k.a. "Slim") | On or about November 21, 2025, at Addison, in the Northern District of Illinois, Eastern Division, JOEL ANDRADE (a.k.a. "Wedo") and JEREMY RUSH (a.k.a. "Slim") did knowingly and intentionally distribute a quantity of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of 21 U.S.C. § 841(a)(1). |

| | |
|---|---|
| **Count Eight:**<br>21 U.S.C. § 841(a)(1)<br><br>**Defendant(s):**<br>JOEL ANDRADE (a.k.a. "Wedo") and<br>JEREMY RUSH (a.k.a. "Slim") | On or about December 19, 2025, at Villa Park, in the Northern District of Illinois, Eastern Division, JOEL ANDRADE (a.k.a. "Wedo") and JEREMY RUSH (a.k.a. "Slim") did knowingly and intentionally distribute a quantity of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of 21 U.S.C. § 841(a)(1). |
| **Count Nine:**<br>21 U.S.C. § 841(a)(1)<br><br>**Defendant(s):**<br>JOEL ANDRADE (a.k.a. "Wedo") and<br>MARIA BRENDA MORA-HERNANDEZ | On or about December 23, 2025, at Chicago, in the Northern District of Illinois, Eastern Division, JOEL ANDRADE (a.k.a. "Wedo") and MARIA BRENDA MORA-HERNANDEZ did knowingly possess with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of 21 U.S.C. § 841(a)(1). |
| **Count Ten:**<br>18 U.S.C. § 924(c)<br><br>**Defendant(s):**<br>JOEL ANDRADE (a.k.a. "Wedo") and<br>MARIA BRENDA MORA-HERNANDEZ | On or about December 23, 2025, at Chicago, in the Northern District of Illinois, Eastern Division, JOEL ANDRADE (a.k.a. "Wedo") and MARIA BRENDA MORA-HERNANDEZ did knowingly possess a firearm, namely, one Glock 19 9mm semi-automatic pistol, bearing serial number TKV705, and one semi-automatic .223 caliber pistol, bearing no serial number, in furtherance of a drug-trafficking crime for which they may be prosecuted in a court of the United States, namely, possession with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), as charged in Count Nine of this Complaint; all in violation of 18 U.S.C. § 924(c). |

This criminal complaint is based upon these facts:

  X   Continued on the attached sheet.

*George E. Hobbs*
GEORGE E. HOBBS
Special Agent, Federal Bureau of Investigation
(FBI)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: January 28, 2026     11:11 pm     _____
                                              *Judge's signature*

City and state: Chicago, Illinois     Beth W. Jantz, U.S. Magistrate Judge
                                              *Printed name and title*

3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## AFFIDAVIT

I, GEORGE E. HOBBS, being duly sworn, state as follows:

## I.    Introduction

1.    I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since approximately March 2018. My responsibilities as an FBI Special Agent include the investigation of narcotics trafficking offenses, including violations of the federal controlled substance laws, including 21 U.S.C. §§ 841, 843, and 846. I have participated in numerous investigations involving controlled substances and I have participated in investigations that led to the seizure of drugs, weapons, and assets derived from the sale of drugs, and the subsequent felony arrests of those individuals involved.  I have been involved with various electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage and importation of controlled substances.

2.    This affidavit is made in support of a multi-count complaint that charges as follows:

a.    **Count One:** Beginning no later than October 15, 2025, and continuing to on or about January 15, 2026, at Chicago, in the Northern District of Illinois, and elsewhere, defendants JOEL ANDRADE (a.k.a. "Wedo") and MARIA BRENDA MORA-HERNANDEZ did conspire with each other and with others known

1

and unknown to knowingly and intentionally possess with intent to distribute and distribute a controlled substance, namely, 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of 21 U.S.C. § 841(a)(1); all in violation of 21 U.S.C. § 846. *See* paragraphs 8 to 72 below.

      b. **Count Two:** On or about June 5, 2025, at Rosemont, in the Northern District of Illinois, Eastern Division, JOEL ANDRADE (a.k.a. "Wedo") and DEVONTE JONES did knowingly and intentionally distribute a quantity of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of 21 U.S.C. § 841(a)(1). *See* paragraphs 73 to 79 below.

      c. **Count Three:** On or about June 19, 2025, at Rosemont, in the Northern District of Illinois, Eastern Division, JOEL ANDRADE (a.k.a. "Wedo"), JOSE NAVARRETE, and JEREMIE REYES-GONZALEZ did knowingly and intentionally distribute a quantity of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of 21 U.S.C. § 841(a)(1). *See* paragraphs 80 to 85 below.

      d. **Count Four:** On or about November 14, 2025, at Chicago, in the Northern District of Illinois, Eastern Division, ALEXIS GUTIERREZ did knowingly possess with intent to distribute a quantity of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of 21 U.S.C. § 841(a)(1). *See* paragraph 86 below, which references paragraphs 18 to 26.

2

e.     **Count Five:** On or about November 16, 2025, at Chicago, in the Northern District of Illinois, Eastern Division, JOEL ANDRADE (a.k.a. "Wedo"), RICHARD RUBIO, and ALEXIS ANDRADE did knowingly possess with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of 21 U.S.C. § 841(a)(1). *See* paragraphs 87 to 110 below.

f.     **Count Six:** On or about November 16, 2025, at Chicago, in the Northern District of Illinois, Eastern Division, RICHARD RUBIO and ALEXIS ANDRADE did knowingly possess a firearm, namely, one Glock 17 9mm semi-automatic pistol, bearing serial number BVSL666, and one semi-automatic 7.62x39mm pistol, bearing no serial number, in furtherance of a drug-trafficking crime for which they may be prosecuted in a court of the United States, namely, possession with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), as charged in Count Five of this Complaint; all in violation of 18 U.S.C. § 924(c). *See* paragraphs 87 to 110 below.

g.     **Count Seven:** On or about November 21, 2025, at Addison, in the Northern District of Illinois, Eastern Division, JOEL ANDRADE (a.k.a. "Wedo") and JEREMY RUSH (a.k.a. "Slim") did knowingly and intentionally distribute a quantity of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of 21 U.S.C. § 841(a)(1). *See* paragraphs 111 to 121 below.

h.  **Count Eight:** On or about December 19, 2025, at Addison, in the Northern District of Illinois, Eastern Division, JOEL ANDRADE (a.k.a. "Wedo") and JEREMY RUSH (a.k.a. "Slim") did knowingly and intentionally distribute a quantity of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of 21 U.S.C. § 841(a)(1). *See* paragraphs 122 to 125 below.

i.  **Count Nine:** On or about December 23, 2025, at Chicago, in the Northern District of Illinois, Eastern Division, JOEL ANDRADE (a.k.a. "Wedo") and MARIA BRENDA MORA-HERNANDEZ did knowingly possess with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of 21 U.S.C. § 841(a)(1). *See* paragraph126 below, which references paragraphs 50 to 69.

j.  **Count Ten:** On or about December 23, 2025, at Chicago, in the Northern District of Illinois, Eastern Division, JOEL ANDRADE (a.k.a. "Wedo") and MARIA BRENDA MORA-HERNANDEZ did knowingly possess a firearm, namely, one Glock 19 9mm semi-automatic pistol, bearing serial number TKV705, and one semi-automatic .223 caliber pistol, bearing no serial number, in furtherance of a drug-trafficking crime for which they may be prosecuted in a court of the United States, namely, possession with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), as charged in Count Nine of this Complaint; all in violation of 18 U.S.C. § 924(c). *See* paragraph 126 below, which references paragraphs 50 to 69.

3.     Because this affidavit is being submitted for the limited purpose of establishing probable cause to support the criminal complaint and the issuance of arrest warrants against the proposed defendants, it contains only a summary of relevant facts. I have not included each and every fact known to me concerning this investigation.

4.     The statements contained in this Affidavit are based in part on: (a) my personal participation in this investigation; (b) information provided by other federal and local law enforcement officers ("LEOs"); (c) review of conversations intercepted pursuant to orders authorizing the interception of wire and electronic communications; (d) laboratory analysis reports; (e) surveillance reports; (f) criminal history records; (g) information from cooperating sources; and (h) my training and experience and the training and experience of other LEOs with whom I have consulted.

## II.     Background of the Investigation

5.     The complaint is based on a joint investigation by the FBI and the Chicago Police Department ("CPD"). In summary, and as set forth below, JOEL ANDRADE (a.k.a. "Wedo"), himself and through his associates, traffics narcotics in the Chicago area and surrounding suburbs. Between on or about March 5, 2025, and December 19, 2025, undercover officers made approximately 24 controlled purchases of cocaine from ANDRADE—14 purchases were directly from ANDRADE and 10 purchases were arranged by ANDRADE delivered by ANDRADE's associates.

6.     On November 3, 2025, Chief Judge Virginia Kendall of the U.S. District

Court for the Northern District of Illinois, authorized a Title III wire intercept of a cell phone used by ANDRADE to conduct these controlled purchases ("ANDRADE's Phone")[1]. On December 17, 2025, Chief Judge Kendall authorized a renewed Title III wire intercept of ANDRADE's Phone and original Title III electronic intercept of ANDRADE's Phone. Interception periods for ANDRADE's Phone are listed below:

| Type of Interceptions | Intercept Period |
|---|---|
| Wire | 11/3/2025 to 12/2/2025 |
| Wire and Electronic | 12/17/25 to 1/15/26 |

7.     The transcripts of the conversations described in this Affidavit remain in draft form. To the extent quotations from the conversations are included, they are preliminary, not final. The summaries of recorded conversations in this affidavit do not include reference to all of the topics covered during the conversations. In certain instances, I will offer my interpretations of certain recorded conversations in brackets and otherwise. My understanding of these conversations is aided by the contents and context of the conversations, my familiarity with the facts and circumstances of the

---

[1] ANDRADE's Phone is a cellular telephone assigned telephone number (XXX) XXX-3222, and International Mobile Subscriber Identity (IMSI) number XXXXXXXXXXXXXXX899, serviced by T-Mobile, subscribed to "Joel Andrade" at an address on South Artesian Avenue in Chicago, Illinois, and used by ANDRADE. Between March 2025 and January 2026, undercover officers had multiple in-person and audio and video recorded meetings with ANDRADE. One of the undercover officers, referred to as UC-3 in this Affidavit, identified ANDRADE based on a comparison with a known photograph of ANDRADE. UC-3 identified ANDRADE's voice based upon UC-3's in-person and phone conversations with ANDRADE and the voice of the user of ANDRADE's Phone. Further, based on my own review of ANDRADE speaking in the audio and video-recorded meetings with UC-3, I am able to identify ANDRADE as the person speaking on the calls between UC-3 and ANDRADE's Phone based on a comparison between the recordings of the voice on those calls and ANDRADE's voice on the audiovisual recordings made during UC-3's meetings with ANDRADE, and a comparison of ANDRADE's physical appearance to ANDRADE's known photograph.

investigation, my experience as a law enforcement agent, my discussions with other law enforcement agents and officers, the experience of other law enforcement agents and officers in this investigation, and other evidence developed during the course of the investigation. The times listed for the recorded conversations are approximate.

## III.    Summary of Probable Cause

### A.    COUNT ONE: ANDRADE and MARIA BRENDA MORA-HERNANDEZ Conspired to Possess with Intent to Distribute and Distribute Cocaine Between October 15, 2025, and January 15, 2026

8.    According to my knowledge of this investigation and surveillance, ANDRADE and MARIA BRENDA MORA-HERNANDEZ are in a domestic relationship, share two minor sons, and reside together at an apartment located at XXXX W. 21st Place in Chicago, Illinois ("ANDRADE's Residence"). In summary and as described below, MORA-HERNANDEZ delivers narcotics, collects money, and moves narcotics and firearms on ANDRADE's behalf.

9.    According to CPD reports, on October 8, 2025, at approximately 1:35 a.m., multiple shooters shot ANDRADE while he was sitting in a vehicle in the 2400 block of West 21st Place in Chicago, Illinois. According to CPD POD[2] cameras, the shooters fled southbound on Western Avenue in a red sedan. Following the shooting, ANDRADE drove himself to Mt. Sinai Hospital in Chicago. ANDRADE sustained gunshot wounds to his arm and hand and required surgery. According to surveillance and intercepted phone calls, ANDRADE was released from the hospital on October

---

[2] Police observation device, or POD, cameras are surveillance cameras that have been placed at various locations throughout Chicago and are monitored by Chicago Police personnel.

19, 2025. Due to his injuries, ANDRADE has been almost exclusively confined to his home since his release from the hospital. As a result, ANDRADE has been directing MORA-HERNANDEZ and other associates to distribute cocaine on his behalf.

*October 16, 2025 - MORA-HERNANDEZ Distributed Cocaine to UC-3 for ANDRADE*

10.    On October 16, 2025, at approximately 1:11 p.m., an undercover CPD officer, UC-3, placed a telephone call to ANDRADE, who was using ANDRADE's Phone[3]. During the call UC-3 asked to purchase cocaine later that afternoon from ANDRADE and ANDRADE agreed.[4] UC-3 and ANDRADE had the following conversation (in Spanish, translated to English):[5]

| | |
|---|---|
| UC-3: | "I wanted to know if I can order an, an ounce [of cocaine]." |
| ANDRADE: | "Meet in the same place." |
| UC-3: | "Over at the, at the chicken?" |
| ANDRADE: | "At 22nd and Rockwell." |
| UC-3: | "Ok, but around, around, around, 5:00. I'm working right now." |
| ANDRADE: | "Yeah, that's fine." |
| UC-3: | "Ok then. I'll call you." |

---

[3] ANDRADE used ANDRADE's Phone for all phone calls and text messages referenced in this Affidavit, unless otherwise noted.

[4] All calls involving undercover officers referenced in this Affidavit were recorded. As described further below, UC-3 had arranged for the purchases of cocaine from ANDRADE on multiple occasions prior to October 16, 2025.

[5] UC-3 was equipped with audio and video recording devices for this and all other controlled purchases detailed in this Affidavit.

11.     At approximately 4:25 p.m., UC-3 placed a telephone call to ANDRADE and informed ANDRADE that he/she was on the way to the Little Village neighborhood. ANDRADE directed UC-3 to the area around the intersection of Cermak Road and Rockwell Street .

12.     At approximately 5:20 p.m., UC-3 placed a telephone call to ANDRADE and informed ANDRADE that he/she was waiting near Cermak Road and Rockwell Street in a parking lot.

13.     At approximately 5:42 p.m., UC-3 received a telephone call from ANDRADE.  During that call, ANDRADE informed UC-3 that ANDRADE'S "wife" would deliver the cocaine. UC-3 and ANDRADE had the following conversation (in Spanish, translated to English):

| | |
|---|---|
| ANDRADE: | "Hey, you're already at Pete's [Fresh Market], right?" |
| UC-3: | "I'm here at Pete's, yes." |
| ANDRADE: | "Ok, my, my, my wife will go there dude. In two minutes." |
| UC-3: | "In two minutes? Ok." |
| ANDRADE: | "Yes." |
| UC-3: | "I'll wait for her. I'm by the currency exchange. I'm parked in a black car." |
| ANDRADE: | "Ok." |

14.     Shortly thereafter, surveillance officers saw a gray Mazda 6 sedan double-parked in front of ANDRADE's Residence, and a woman later identified as

9

MARIA BRENDA MORA-HERNANDEZ[6] exited the residence and entered the driver's door of the gray Mazda 6. MORA-HERNANDEZ drove eastbound on 21st Place and crossed Rockwell Street into the parking lot of Pete's Fresh Market and parked in the lot.

15.    At approximately 5:58 p.m., ANDRADE, MORA-HERNANDEZ[7], and UC-3 spoke on a three-way call to coordinate the meeting between UC-3 and MORA-HERNANDEZ. During the call, ANDRADE referred to MORA-HERNANDEZ as "Brenda" (i.e., MORA-HERNANDEZ's middle name). UC-3, MORA-HERNANDEZ, and ANDRADE had the following conversation (in Spanish, translated to English):

| ANDRADE: | "Hello." |
|---|---|
| UC-3: | "Yes." |
| ANDRADE: | "Brenda." |
| MORA-HERNANDEZ: | "(unintelligible)" |
| UC-3: | "I'm here in the parking lot, look." |
| MORA-HERNANDEZ: | "Where?" |
| UC-3: | "In Pete's." |

...

---

[6] UC-3 subsequently identified MORA-HERNANDEZ in a photo lineup as the individual who sold him/her cocaine on October 16, 2025.

[7] Law enforcement identified the female speaker as MORA-HERNANDEZ based on a recording of MORA-HERNANDEZ from an undercover controlled narcotics purchase and the fact that, during intercepted calls, ANDRADE frequently refers to the female as "Brenda," which is MORA-HERNANDEZ's middle name. According to subscriber information, this number is registered to MARIA MORA.

| | |
|---|---|
| UC-3: | "Oh where. Which car are you in?" |
| MORA-HERNANDEZ: | "A black, white one." |

...

| | |
|---|---|
| UC-3: | "Ok, ok, I'm on the way. I'm walking over here. I have a black shirt on." |
| MORA-HERNADNEZ: | "Oh he's walking. I thought he had a car. |

16. Following this call, UC-3 approached the driver's window of the gray Mazda 6. MORA-HERNANDEZ was in the driver's seat, an unknown Hispanic male was in the front passenger seat, and an unknown Hispanic male was in the rear passenger seat. MORA-HERNANDEZ handed UC-3 a clear plastic bag containing a white substance suspected to be cocaine and accepted $600 from UC-3. During their conversation, UC-3 could see MORA-HERNANDEZ's cell phone screen was displaying the phone number for ANDRADE's Phone and UC-3 could hear ANDRADE's voice coming from MORA-HERNANDEZ's cell phone. Due to the fact that MORA-HERNANDEZ was still on the phone with ANDRADE, the conversation between UC-3 and MORA-HERNANDEZ during the transaction was captured (in Spanish, translated to English):

| | |
|---|---|
| UC-3: | "What's up? How are you?" |
| MORA-HERNANDEZ: | "Good, how about you?" |
| UC-3: | "Good, just here trying hard. Ok, do you want to count it?" |
| MORA-HERNANDEZ: | "Ah." |
| UC-3: | "If you want, count it. He told me six [$600], it's always six. Are we good?" |

| MORA-HERNANDEZ: | "We're good." |
|---|---|
| UC-3: | "Ok, till next time." |

17.     Following the transaction, UC-3 met with law enforcement agents and turned over a clear plastic bag containing a white substance, suspected cocaine. The suspected cocaine later field tested positive for the presence of cocaine and weighed approximately 28.9 gross grams, including packaging.

### *November 14, 2025 - MORA-HERNANDEZ Distributed Cocaine to ALEXIS GUTIERREZ; Law Enforcement Seized Cocaine from GUTIERREZ*

18.     The November 14, 2025 conduct in this section applies to both the drug conspiracy charged in Count One of the Complaint against ANDRADE and MORA-HERNANDEZ and the substantive possession with intent to distribute a controlled substance count charged against GUTIERREZ in Count Four of the Complaint.

19.     On November 14, 2025, at approximately 5:42 p.m., Title III intercept session 5894 captured an incoming call to ANDRADE from telephone number (XXX) XXX-9703, used by ALEXIS GUTIERREZ.[8] During the call GUTIERREZ stated, "I'm finna slide," [I'm coming] and ANDRADE responded, "Alright come on." GUTIERREZ replied, "Be ready nigga," and ANDRADE ended the call stating, "Alright hit me up".

---

[8] Agents identified the male speaker as ALEXIS GUTIERREZ based on information developed following GUTIERREZ's arrest on November 14, 2025. As detailed below, following his arrest, law enforcement identified GUTIERREZ as the driver of the black Porsche Cayenne based on identification GUTIERREZ provided to officers. Following GUTIERREZ's arrest, law enforcement used a covert telephone to call telephone number (XXX) XXX-9703 and agents observed GUTIERREZ's phone, which was in law enforcement custody, ring. Law enforcement also saw that the lock screen for GUTIERREZ's phone displayed a photo of GUTIERREZ and a child.

20.     At approximately 5:46 p.m., Title III intercept session 5900 captured an incoming call to ANDRADE from GUTIERREZ, and they engaged in the following conversation:

GUTIERREZ:      "Remember what you told me last week? Are we going to do that or not?"

ANDRADE:        "Call me when you get in the back."

GUTIERREZ:      "Alright just be ready, I want you to 1, 2, 3."

21.     Based on my training, experience, and knowledge of the investigation, ANDRADE's statement "call me when you get in the back" referred to the alley behind ANDRADE's Residence, and GUTIERREZ told ANDRADE to be ready, so he did not have to wait.

22.     At approximately 6:19 p.m., Title III intercept session 5916 captured an incoming call to ANDRADE from GUTIERREZ, and they engaged in the following conversation:

GUTIERREZ:      "[UI]…this shit bad, 'cause I'ma put this shit in the water."

ANDRADE:        "It's a half a brick [one-half kilogram] right there, dog."

GUTIERREZ:      "Alright, cool, look, I'm trying [UI] it don't look like the other shit, know what I mean?"

ANDRADE:        "That's a half a brick, dog."

23.     Based on my training, experience, and knowledge of the investigation, I believe the above exchanges between ANDRADE and GUTIERREZ were calls setting up and then conducting a narcotics transaction for one-half kilogram of cocaine. A

"brick" is a term commonly used to describe one kilogram of cocaine packaged in a way that resembles a brick, so I believe "half a brick" is one-half kilogram of cocaine.

24. At approximately 6:17 p.m., agents monitoring the live feed from a pole camera capturing the area near the alley behind ANDRADE's Residence observed a black Porsche Cayenne registered to GUTIERREZ arrive behind ANDRADE's Residence. Agents observed GUTIERREZ exit the driver's seat of the Porsche and approach MORA-HERNANDEZ. GUTIERREZ and MORA-HERNANDEZ exchanged items before GUTIERREZ got back into his vehicle. In my training and experience, this appeared to be a narcotics transaction.

25. Shortly thereafter, CPD attempted to conduct a traffic stop on the Porsche Cayenne on Roosevelt Road being driven by GUITERREZ. GUTIERREZ fled from officers and drove the Porsche down the sidewalk and threw suspected narcotics from the vehicle before crashing approximately two blocks away near the intersection of Roosevelt Road and Homan Avenue in Chicago. The Porsche crashed into several law enforcement surveillance vehicles and officers arrested GUTIERREZ as well as a passenger located in the rear seat of the vehicle. Officers recovered the suspected cocaine that was thrown from the Porsche as it fled and its size and shape resembled the item MORA-HERNANDEZ had handed to GUTIERREZ as discussed above.

26. The DEA North Central Laboratory later tested the suspected cocaine, where it was found to consist of approximately 482.6 grams of cocaine.

*November 16, 2025 - MORA-HERNANDEZ Retrieved a Firearm from Individual A*

27.     In summary and as described in more detail below in paragraphs 87-110, on November 16, 2025, ANDRADE orchestrated a robbery involving ALEXIS ANDRADE, RICHARD RUBIO, and Individual A taking five kilograms of cocaine from Individual B and Individual C.[9] Officers arrested ALEXIS ANDRADE and RUBIO following a vehicle pursuit that ended with their vehicle crashing at approximately 3:27 p.m.

28.     According to pole camera surveillance behind ANDRADE's Residence, at approximately 3:30 p.m., Individual A arrived in a gray Honda Accord,[10] exited the vehicle, and handed a pistol to MORA-HERNANDEZ at the gate entrance to the backyard. MORA-HERNANDEZ then took the pistol inside ANDRADE's Residence and Individual A departed.

*November 20, 2025 - MORA-HERNANDEZ Distributed Cocaine to Individual D; Law Enforcement Seized the Cocaine from Individual D*

29.     On November 20, 2025, at approximately 3:15 p.m., Title III intercept session 7999 captured an outgoing call from ANDRADE to phone number (XXX) XXX-0231, used by Individual D.[11] ANDRADE and Individual D engaged in the following conversation:

---

[9] For purposes of this Affidavit, I will refer to JOEL ANDRADE as "ANDRADE" and ALEXIS ANDRADE by his first and last name.

[10] According to Illinois Secretary of State records, the gray Honda Accord was registered to INDIVIDUAL A.

[11] Law enforcement identified the male speaker as Individual D following his arrest on November 20, 2025 based on the fact that when the person told ANDRADE on the phone that "I'm in the alley now," law enforcement was observing the pole cam near ANDRADE's

ANDRADE:          [Yelling at person in background] "Oh my god, dog! Hello?"

Individual D:     "Hello."

ANDRADE:          "Hey dog my bad, two minutes come to the alley."

Individual D:     "Alright."

30.    Based on my training, experience, and knowledge of this investigation, I believe ANDRADE was telling Individual D he would have someone in the alley behind ANDRADE's Residence in two minutes to deliver narcotics to Individual D.

31.    At approximately 3:21 p.m., Title III intercept session 8003 captured an incoming call to ANDRADE from Individual D, and they engaged in the following conversation:

ANDRADE:          "Yeah hello?"

Individual D:     "Yeah I'm in the alley now."

ANDRADE:          "Alright I'm going…[Yelling in the background] Brenda!"

32.    Based on my training, experience, and knowledge of this investigation, I believe after Individual D let ANDRADE know he was in the alley behind ANDRADE's Residence, ANDRADE yelled in the background to MORA-HERNANDEZ (i.e., "Brenda") to direct her outside to deliver cocaine to Individual D.

---

Residence and saw a person in alley get out of his vehicle to make an exchange with MORA-HERNANDEZ. Law enforcement compared the person in the alley to an Illinois Secretary of State photo of Individual D and determined they were the same person. Additionally, subscriber records show that (XXX) XXX-0231 is registered to Individual D at an address in Beloit, Wisconsin.

33.     At approximately 3:25 p.m., according to the live feed from the pole camera capturing the area behind ANDRADE's Residence, a white 2017 Nissan Murano[12] arrived in the alley behind the residence. An unknown black male later identified as Individual D exited the driver's seat of the Murano, approached MORA-HERNANDEZ, handed something to MORA-HERHNANDEZ and received something in exchange. In my training and experience, I believe this was a narcotics transaction. Individual D then opened the driver's side rear door of the Murano and placed the suspected narcotics in the rear passenger area before departing the area.

34.     Law enforcement conducting surveillance followed Individual D from ANDRADE's Residence until Illinois State Police ("ISP") Troopers conducted a traffic stop on the Murano for speeding on westbound Interstate-90 in Boone County, Illinois. An ISP narcotics canine alerted to the presence of narcotics in the vehicle. A subsequent search revealed approximately 510 grams of suspected cocaine inside the vehicle. Individual D provided identification to Troopers, who arrested him.

35.     The suspected cocaine weighed 510 gross grams, including packaging, and field-tested positive for the presence of cocaine.

*November 21, 2025 - Narcotics Delivery to MORA-HERNANDEZ*

36.     On November 21, 2025, at approximately 7:32 p.m., Title III intercept session 8435 captured an incoming call to ANDRADE from MORA-HERNANDEZ. ANDRADE and MORA-HERNANDEZ engaged in the following conversation:

---

[12] According to records from the state of Wisconsin, the 2017 Nissan Murano is registered to an individual with the same address in Beloit, Wisconsin, as associated with the subscriber records for the phone used by Individual D (i.e., (XXX) XXX-0231).

| | |
|---|---|
| MORA-HERNANDEZ: | "He said it was what...a black...black Dodge..." |
| ANDRADE: | "A black pickup. Ram. Dodge." |
| MORA-HERNANDEZ: | "Ok, black pickup. I see it, it's a long-haired guy?" |
| ANDRADE: | "Yeah I guess." |

37.     Based on my training, experience, and knowledge of the investigation, I believe ANDRADE was informing MORA-HERNANDEZ what type of vehicle she was looking to meet to conduct a narcotics transaction.

38.     At approximately 7:33 p.m., Title III intercept session 8437 captured an incoming call to ANDRADE from MORA-HERNANDEZ, and they engaged in the following conversation:

| | |
|---|---|
| ANDRADE: | "Hello." |
| MORA-HERNANDEZ: | "Do I jump over there..." |
| ANDRADE: | "Beep at 'em, beep at 'em, beep at 'em." |
| MORA-HERNANDEZ: | [U/I] |
| ANDRADE: | "Hold on." |

39.     Based on my training, experience, and knowledge of the investigation, I believe MORA-HERNANDEZ was asking ANDRADE how she should approach the driver of the Dodge Ram to conduct the narcotics transaction.

40.     At approximately 7:38 p.m., Title III intercept session 8452 captured an outgoing call from ANDRADE to MORA-HERNANDEZ, and they engaged in the following conversation:

| | |
|---|---|
| ANDRADE: | "Yeah hello? What happened?" |

| MORA-HERNANDEZ: | "I'ma put it in…[U/I]…bro." |
|---|---|
| ANDRADE: | "You got them in the stash [trap, or hidden compartment][13] already?" |
| MORA-HERNANDEZ: | "No, I got it opened." |
| ANDRADE: | "There's six of them [six kilograms of cocaine] already?" |
| MORA-HERNANDEZ: | "I have to count them." |
| ANDRADE: | "Alright. Well come on, 'cause I got like three people [customers] waiting." |

41.     Based on my training, experience, and knowledge of the investigation, I believe ANDRADE was attempting to confirm with MORA-HERNANDEZ that she received the expected amount of narcotics and stored the narcotics in the trap (i.e., the "stash") in the Dodge Journey that she was driving. ANDRADE then instructed MORA-HERNANDEZ to hurry with stashing the narcotics because he had narcotics customers that he needed MORA-HERNANDEZ to serve.

42.     At approximately 7:39 p.m., according to the live feed from a pole camera located in front of ANDRADE's Residence, MORA-HERNANDEZ was in the driver's seat of a red Dodge Journey.[14] MORA-HERNANDEZ opened an orange and white box and removed six brick-shaped objects wrapped in green packaging from the box and placed them in the backseat area of the Dodge Journey. Based on my training and

---

[13] Based on intercepted calls, law enforcement knows ANDRADE to have trap compartments in multiple vehicles that he utilizes to store narcotics and/or narcotics proceeds and/or firearms.

[14] According to Illinois Secretary of State records, the Dodge Journey is registered to an individual with an address on South Komensky Avenue in Chicago, Illinois.

experience, the six objects appeared to be kilogram-sized packages of narcotics. MORA-HERNANDEZ then climbed from the driver's seat into the rear passenger area where she could not be observed. After several minutes MORA-HERNANDEZ climbed back into the driver's seat and then exited the Dodge Journey.

43. Based on my training and experience, and the discussions in the above-detailed calls, I believe MORA-HERNANDEZ, at ANDRADE's direction, received six kilograms of cocaine from an unknown supplier. MORA-HERNANDEZ then placed those kilograms into an aftermarket "trap" designed to conceal illegal contraband in the rear of the Dodge Journey.

*December 18, 2025 - JOSE NAVARRETE Delivered a Firearm to ANDRADE's Residence and MORA-HERNANDEZ Retrieved it*

44. On December 18, 2025, at approximately 12:01 p.m., Title III intercept session 12800 captured an incoming call to ANDRADE from telephone number (XXX) XXX-3303, used by JOSE NAVARRETE[15] and they engaged in the following conversation:

NAVARRETE:      "Hey, who's there right there with you?"

ANDRADE:         "Myself."

NAVARRETE:      "Damn, nobody can come out and grab this?"

ANDRADE:         "Alright, hold on."

---

[15] On July 11, 2025, CPD conducted surveillance of a blue Lexus GS300 registered to NAVARRETE. When NAVARRETE exited the vehicle at a car wash, officers used a covert phone to call (XXX) XXX-3303. Officers observed NAVARRETE answer his phone and engage in a conversation with the officer, during which NAVARRETE referred to himself as "J." when officers ended the call, they observed NAVARRETE also end the call and put his phone away.

| NAVARRETE: | "Cause nigga, I ain't gonna lie, I got this shit on me, U/I." |
|---|---|
| ANDRADE: | "You in the back?" |
| NAVARRETE: | "I'm in the back, yeah." |
| ANDRADE: | "You probably gonna have to hop the fence, unless you wanna take it with you." |
| NAVARRETE: | "Hell no I don't wanna take it with me, I don't wanna bring it back later, I gotta bring you the other one." |
| ANDRADE: | "Come on hop the fence. I'm watching right now anyway." |
| NAVARRETE: | "The front gate or the back?" |
| ANDRADE: | "Oh you know what, come through the front, come through the front." |
| NAVARRETE: | "You just drop me the keys, no?" |
| ANDRADE: | "No, no, it's open, come on." |

45.     On December 18, 2025, at approximately 12:06 p.m., Title III intercept session 12802 captured an incoming call to ANDRADE from NAVARRETE. During the call, ANDRADE directed NAVARRETE into the back yard of ANDRADE's Residence and ANDRADE and NAVARRETE engaged in the following conversation:

| NAVARRETE: | "The back door is not open?" |
|---|---|
| ANDRADE: | "No it's not open. That's what I'm saying. You see where the um, the grill, or whatever the fuck that shit is?" |
| NAVARRETE: | "Yeah I'm gonna put it in the grill." |
| ANDRADE: | "Damn put it in the grill." |
| NAVARRETE: | "Oh perfect, and you got a camera right there." |
| ANDRADE: | "Bitch I got cameras everywhere." |

NAVARRETE:     "That's good."

ANDRADE:     "I got like eight cameras, nigga."

NAVARRETE:     "Fucking, that clip's full, too."

46.    In my training and experience, I believe when NAVARRETE said, "that clip's full," he was referring to a firearm with a full magazine of ammunition.

47.    At approximately 12:07 p.m., according to live feed from the pole camera behind ANDRADE's Residence, NAVARRETE moved from the front of ANDRADE's Residence to the backyard. Officers saw that NAVARRETE was on his cell phone. NAVARRETE approached a grill located behind the residence, lifted the lid of the grill, and placed an unknown object in the grill (the object was obscured by the lid of the grill). NAVARRETE then left the backyard through the gangway on the side of the residence.

48.    At approximately 4:08 p.m., according to live feed from the pole camera behind ANDRADE's Residence, MORA-HERNANDEZ exited the residence and entered the backyard with a small dog. MORA-HERNANDEZ approached the grill, lifted the lid, and grabbed an unknown object and put it inside her coat. MORA-HERNANDEZ closed the lid of the grill and was observed holding an object inside her coat against her body. MORA-HERNANDEZ then re-entered the residence.

49.    Based on my training and experience, the context of the calls between ANDRADE and NAVARRETE, and discussions with other law enforcement officers, I believe NAVARRETE dropped off a firearm to ANDRADE, leaving it inside the grill in the backyard. I believe NAVARRETE left the firearm in the grill because no

members of ANDRADE's family were at ANDRADE's Residence to retrieve the firearm, the downstairs door to the residence was locked, and ANDRADE could not go downstairs due to his physical condition. I believe MORA-HERNANDEZ retrieved a firearm from the grill after she returned to ANDRADE's Residence while taking the dog outside before returning inside the residence with the firearm.

> *December 23, 2025 – Law Enforcement Executed a Federal Search Warrant on the Dodge Journey and Recovered Cocaine, Firearms, and U.S. Currency*

50.     The December 23, 2025 conduct in this section also applies to the allegations in Counts Nine and Ten of the Complaint.

51.     On December 22, 2025, at approximately 11:06 a.m., Title III intercept session 14429 captured an incoming call to ANDRADE from JEREMY RUSH[16]. During the call, ANDRADE told RUSH he was trying to have her [MORA-HERNANDEZ] "call you, I told her to go but she ain't…I don't know where you're at." RUSH responded with his address, "5XX West Division Street." ANDRADE told RUSH he would have his "baby momma go over there right now."

52.     At approximately 4:23 p.m., surveillance officers observed MORA-HERNANDEZ and her and ANDRADE's minor son enter a Dodge Journey in the vicinity of ANDRADE's Residence. At approximately 4:30 p.m., law enforcement

---

[16] Agents identified the male speaker as RUSH based on recordings of RUSH from undercover controlled narcotics purchases. According to subscriber information, this number is registered to JEREMY RUSH. Additionally, a confidential source ("CS") has provided law enforcement with this telephone number for RUSH who, according to the CS and law enforcement databases, goes by the nickname "Slim."

observed the Journey stop in the area of a pizza restaurant located in the 6200 block of West Cermak Road in Berwyn, Illinois.

53. At approximately 4:30 p.m., Title III intercept session 14530 captured an incoming call to ANDRADE from MORA-HERNANDEZ. During the phone call, ANDRADE told MORA-HERNANDEZ to deliver the "four and a split" [four and one-half ounces of cocaine]. MORA-HERNANDEZ asked if it was "the little one, or your pee bag?" ANDRADED responded, "no, the other one." MORA-HERNANDEZ asked, "the one with the zipper?" ANDRADE said, "yes." MORA-HERNANDEZ asked if "the pee bag is for Slim?" [known by law enforcement to be an alias for RUSH], and ANDRADE said, "yes."

54. Law enforcement observed an unknown male exit the pizza restaurant and interact with MORA-HERNANDEZ at the driver's window of the Dodge Journey. Shortly thereafter, MORA-HERNANDEZ departed the area in the Journey.

55. According to CPD reports, law enforcement followed the Dodge Journey to the area of 5XX West Division Street in Villa Park, Illinois, where it arrived at approximately 5:56 p.m.

56. At approximately 5:58 p.m., Title III intercept session 14566 captured an incoming call to ANDRADE from MORA-HERNANDEZ. During the call, MORA-HERNANDEZ asked ANDRADE for directions on where to park. ANDRADE said, "let him in...I want him to pick one of the whole ones [kilogram packages of cocaine]. I don't want him going back and forth, he's got to put the pipe [firearm] back in there."

MORA-HERNANDEZ replied, "Okay, so I open the stash [trap compartment in the Journey] right now?" ANDRADE said, "yes."

57.     During the call, a third individual can be overheard asking, "Do you want me to throw this [a firearm] in the back?" MORA-HERNANDEZ said, "Once you grab that [cocaine], you can just put that in there." Based on my training and experience, as well as my knowledge of this investigation, I believe MORA-HERNANDEZ was directing RUSH to take the drugs and then put the firearm in the trap compartment of the Journey.

58.     During the call, MORA-HERNANDEZ can be overheard directing RUSH to grab "a whole one [a kilogram package of cocaine]" and explains that he has to go "under, under…all the way under." ANDRADE asked HERNANDEZ, "How many are in there…six or seven?" Based on my training and experience, as well as my knowledge of this investigation, I believe ANDRADE was asking HERNANDEZ how many kilograms of cocaine were in the vehicle. MORA-HERNANDEZ told RUSH, "pick one."

59.     During the call, RUSH stated, "I put it in here, fourteen racks right here. It's in the gift wrap. And then the switch is in there too." Based on my training and experience, as well as my knowledge of the investigation, "rack" refers to one thousand dollars and "switch" refers to a device that can be added to a firearm to convert a semi-automatic firearm to fully automatic, which is also known as a machinegun conversion device.

60. At approximately 6:12 p.m., law enforcement observed MORA-HERNANDEZ drive the Dodge Journey from the area of 5XX West Division Street in Villa Park, Illinois, to the area of ANDRADE's Residence, where it arrived at approximately 7:11 p.m.

61. At approximately 7:22 p.m., law enforcement observed an item being thrown out of a window of ANDRADE's Residence to MORA-HERNANDEZ's and ANDRADE's minor son. Based on the size and wrapping of the item, as well as my training and experience, I believe that item to be a package containing narcotics. Law enforcement then observed MORA-HERNANDEZ and the minor son depart the area in the Dodge Journey and travel to a gas station in the 4700 block of South Central Avenue in Chicago, Illinois.

62. At approximately 7:23 p.m., Title III intercept session 14602 captured an outgoing call from ANDRADE to MORA-HERNANDEZ. ANDRADE asked MORA-HERNANDEZ, "How long it says?" MORA-HERNANDEZ asked, "It's a gas station, right?" and ANDRADE responded, "Yes."

63. At approximately 7:34 p.m., law enforcement observed MORA-HERNANDEZ park the Dodge Journey at a gas pump at the gas station. A black Jeep Compass parked at a gas pump near the Journey. Investigators observed a male exit the passenger side of the Jeep Compass and approach the driver's window of the Journey. The unknown male and MORA-HERNANDEZ interacted, and MORA-HERANDNEZ gave the unknown male a package. The unknown male placed the

26

package in his pocket and returned to the Jeep Compass. Shortly thereafter, MORA-HERNANDEZ drove the Dodge Journey away from the area.

64. At approximately 7:54 p.m., law enforcement observed MORA-HERNANDEZ moving a second vehicle in front of ANDRADE's Residence. At approximately the same time, law enforcement observed ANDRADE's and MORA-HERNANDEZ's minor son, who is approximately 12 years old, driving the Dodge Journey.

65. At approximately 8:03 p.m., Title III intercept session 14634 captured an outgoing call from ANDRADE to MORA-HERNANDEZ. During the call, ANDRADE asked his minor son if "that was you parking?" ANDRADE then gave his minor son directions on how to parallel park the vehicle.

66. At approximately 8:11 p.m., CPD officers stopped the Dodge Journey after running the license plate and noting the suspended registration. Officers approached the vehicle and found ANDRADE's minor son in the driver's seat operating the vehicle. Officers transported ANDRADE's minor son to a CPD station and called MORA-HERNANDEZ who later arrived to pick up her minor son. Officers impounded the Dodge Journey and secured it in a CPD facility.

67. At approximately 9:30 p.m., CPD officers used a narcotics canine to conduct a "sniff test" of the Dodge Journey. The canine gave a positive alert indicating the likely presence of narcotics in the vehicle.

68. At approximately 11:05 p.m., Title III intercept session 14757 captured an outgoing call from ANDRADE to (XXX) XXX-8495, the telephone number for the

City of Chicago Auto Pound. While on hold, ANDRADE and MORA-HERNANDEZ can be heard holding a conversation in the background. ANDRADE told MORA-HERNANDEZ, "You gonna owe me, dog. Oh, you forgot? There's 14,000 in there [$14,000], three bricks [three kilograms of cocaine], two pipes [two firearms]...shit, I don't know how you gonna get it out." MORA-HERNANDEZ replied, "U/I...go all the way that way..." ANDRADE stated, "Nobody told you to tell [minor son] to drive the car and park it, nigga," and MORA-HERNANDEZ responded, "I didn't tell him to drive, he didn't even drive." ANDRADE replied, "Nobody told you to do that, when you know there's serious shit in there."

69.     On December 23, 2025, U.S. Magistrate Judge Gabriel A. Fuentes, U.S. District Court for the Northern District of Illinois, authorized a search warrant for the Dodge Journey. Law enforcement executed the warrant that same day and recovered, among other items:

   a.   One Glock 19 pistol with a machinegun conversion device and attached flashlight, bearing serial number TKV705;

   b.   27 live 9mm rounds removed from an extended Glock magazine;

   c.   One AR pistol with no serial number;

   d.   $14,000 United States Currency (of note, 12 of the $100 bills were FBI buy money from the December 19, 2025 controlled purchase of narcotics from ANDRADE and RUSH as alleged in Count Eight); and

   e.   Three brick-shaped packages of a substance that field-tested positive for the presence of cocaine.

*January 15, 2026 - ANDRADE Directed MORA-HERNANDEZ to Cook Crack and Serve Customers.*

70.    On January 15, 2026, at approximately 4:51 p.m., Title III intercept session 23106 captured an incoming call to ANDRADE from MORA-HERNANDEZ, and they engaged in the following conversation:

| | |
|---|---|
| ANDRADE: | "Yeah hello." |
| MORA-HERNANDEZ: | [U/I] |
| ANDRADE: | "You said what, stupid?" |
| MORA-HERNANDEZ: | "Hey what do you want me to do with the other ones, the other left [the other drugs]." |
| ANDRADE: | "He's outside bro, he's been waiting outside Brenda, I thought – the dude, he wants a seven [seven grams], and a 40 [$40 worth of cocaine]." |
| MORA-HERNANDEZ: | "Do I grab from the ones that I just grabbed?" |
| ANDRADE: | "Yeah the ones you just did." |
| MORA-HERNANDEZ: | "Ok....the seven and 40." |
| ...        ANDRADE: | "Hello? Yeah Brenda well come on man, he's outside" |
| ...        ANDRADE: | "Yeah Brenda I think you're gonna have to probably cook up [the process for turning powder cocaine into crack cocaine] two of them [two ounces] right now too." |
| MORA-HERNANDEZ: | "I thought you want me to leave?" |
| ANDRADE: | "Well why don't you serve them [deliver drugs], I don't have no more crack it's over with. So, I need you to cook up those two so we don't gotta come back to the house for a little bit right now. The money I'm |

29

gonna get I'm gonna go pay for the fuckin' dude already too, so."

MORA-HERNANDEZ: "Ten point twelve [MORA-HERNANDEZ is measuring the drugs, and they weigh 10.12 grams] or take some off?"

ANDRADE: "Ten point zero [weighing 10.0 grams]. Then grab the two dubs [two $20 bags] I already got bagged up."

MORA-HERNANDEZ: "Yeah I know."

ANDRADE: "Alright I'm gonna tell him you're going downstairs already."

MORA-HERNANDEZ: "Ok, 10.0"

71. At approximately 4:56 p.m., live feed from the pole camera located behind ANDRADE's Residence showed MORA-HERNANDEZ exit the residence and jog across the back patio to the gate and alley. An unknown male was waiting at the gate, MORA-HERNANDEZ handed the male something, and the male handed something to MORA-HERNANDEZ in exchange. The unknown male then departed the area on foot and MORA-HERNANDEZ reentered the residence.

72. Based on my training and experience, I believe ANDRADE directed MORA-HERNANDEZ to sell narcotics to a waiting customer, which happened when MORA-HERNANDEZ met the unknown male for the hand-to-hand exchange at the gate to the alley. When ANDRADE told MORA-HERNANDEZ "I think you're gonna have to cook up two of them right now," I believe ANDRADE was directing MORA-HERNANDEZ to cook two ounces of crack cocaine inside the residence. I also believe ANDRADE directed MORA-HERNANDEZ to retrieve pre-packaged bags of cocaine to bring to ANDRADE.

**B. COUNT TWO: ANDRADE and DEVONTE JONES Distributed Cocaine to UC-3 on June 5, 2025**

73.     On June 5, 2025, UC-3 called ANDRADE. During the call, UC-3 told ANDRADE he/she was in the Rosemont, Illinois area, and wanted to purchase one-half ounce of cocaine for $400. UC-3 told ANDRADE that he/she was located at the Target store next to Allstate Arena located at 7000 North Mannheim Road, Rosemont, Illinois (the "Target store"). ANDRADE directed UC-3 to send him the address so he could let his friend know. At approximately 5:45 p.m., UC-3 and ANDRADE had the following conversation (in Spanish, translated to English):

| UC-3: | "Hey, wanted to know, cause over here with some friends by Rosemont. Will your guy come this way? I'm over this way." |
|---|---|
| ANDRADE: | "Rosemont? What do you want?" |
| ... | |
| UC-3: | "Half ounce [of cocaine]." |
| ANDRADE: | "Half ounce to Rosemont? Or you come over here?" |
| UC-3: | "No, Rosemont. If I can trust your guy." |
| ANDRADE: | "400 [$400]." |
| UC-3: | "400?" |
| ANDRADE: | "Yes." |
| UC-3: | "Ok, let me talk to these guys then. What do you give me two eights [two 8-balls, an 8-ball is 1/8 of 1 ounce] for?" |
| ANDRADE: | "140 [$140]." |
| UC-3: | "140 each one?" |

31

ANDRADE: "Yes."

74. At approximately 5:51p.m., UC-3 and ANDRADE had the following conversation (in Spanish, translated to English):

UC-3: "Hey, hello, look the 400 is fine."

ANDRADE: "Ok (unintelligible) there's one."

UC-3: "Ok, hey let me see how I'll send it to you. Do you know where the Target is by the Mannheim?"

ANDRADE: "The Mannheim?"

UC-3: "Yeah, where the hotels are, where the Allstate Arena is, on the other side of the Allstate Arena."

ANDRADE: "Uh, no, I don't know. Send me the address cause I don't know where that is."

UC-3: "Ok, oh."

75. UC-3 then sent the address to ANDRADE via a text message so they could coordinate where UC-3 would meet with ANDRADE's friend to conduct the cocaine transaction. UC-3 engaged in the following text exchange with ANDRADE (in Spanish, translated to English):

UC-3 at 5:55 p.m.: 7000 n mannheim rd Rosemont

ANDRADE at 6:10 p.m.: [ANDRADE sent a screenshot of a Google Maps route showing a 50-minute drive from the Little Village area of Chicago to the address UC-3 provided]

UC-3 at 6:17 p.m.: Orale [slang meaning "okay" or "alright"]

ANDRADE at 7:23 p.m.: My friend is in the direction you gave me 7000 n Mannheim rd Rosemont

UC-3 at 7:25 p.m.: I'm at the Target

76. At approximately 7:20 p.m. ANDRADE called UC-3 and informed UC-3 that his friend was near the Target store and driving a red minivan. UC-3 and ANDRADE engaged in multiple phone calls to coordinate UC-3 meeting with ANDRADE's friend in the minivan.[17]

77. Surveillance officers observed a red minivan driven by a male later identified as DEVONTE JONES[18] park in the parking lot near the Target store. No other people were observed in the minivan. UC-3 approached the driver's side window of the minivan and then moved to the front passenger door and opened the door. UC-3 gave JONES $400 and retrieved a clear plastic bag containing suspected cocaine sitting in plain view on the center console.

78. During the conversation with JONES, UC-3 asked if he/she could have JONES' phone number. JONES told UC-3 to go through their friend [ANDRADE] if anything was needed.

79. The DEA North Central Laboratory tested the suspected cocaine that JONES sold to UC-3 on June 5, 2025, and found it to consist of 13.9 grams of cocaine.

### C. COUNT THREE: ANDRADE, JOSE NAVARRETE, and JEREMIE REYES-GONZALEZ Distributed Cocaine to UC-3 on June 19, 2025

---

[17] ANDRADE utilized ANDRADE's Phone as well as a previously unknown number for those conversations.

[18] On June 23, 2025, CPD conducted an investigatory stop of the red minivan driven by the black male who provided UC-3 with cocaine on June 5, 2025. That same black male was driving the red minivan on this date, and officers identified him as JONES. On June 23, 2025, UC-3 identified JONES in a photo lineup as the individual who sold him/her cocaine on June 5, 2025.

80.     On June 19, 2025, UC-3 called ANDRADE. During the call, UC-3 told ANDRADE he/she was in the Rosemont area and wanted to purchase cocaine. UC-3 ordered one-half ounce of cocaine for $400. UC-3 and ANDRADE exchanged multiple phone calls and text messages to update the approximate meeting time and location.

81.     Between 4:23 p.m. and 7:13 p.m., ANDRADE and UC-3 also exchanged text messages where UC-3 sent ANDRADE UC-3's location and ANDRADE sent UC-3 updates on his arrival time so UC-3 and ANDRADE could coordinate meeting to conduct a cocaine transaction.

82.     At 7:54 p.m., phone number (XXX) XXX-3303, used by NAVARRETE[19] contacted ANDRADE. At approximately 8:04 p.m., ANDRADE called UC-3 to tell him/her that his friend was waiting in the Target store parking lot in a red Jeep Wrangler.

83.     According to UC-3 and surveillance, UC-3 approached a red Jeep Wrangler that was parked in the Target store parking lot and opened the rear passenger door. The Jeep was occupied by a Hispanic male driver later identified as

---

[19] On July 11, 2025, CPD surveillance officers conducted physical surveillance of NAVARRETE and REYES-GONZALEZ. Officers followed NAVARRETE and REYES-GONZALEZ, who were in a blue Lexus GS300 registered to NAVARRETE. The blue Lexus traveled from NAVARRETE's residence to a car wash, where NAVARRETE and REYES-GONZALEZ exited the vehicle. At the car wash, officers used a UC phone to call NAVARETTE's 3303 number. Surveillance officers observed NAVARRETE answer his phone and engage in a conversation with the officer, during which NAVARRETE referred to himself as "J." When officers ended the call, they observed NAVARRETE also end his call and put his phone away.

NAVARRETE,[20] a Hispanic male rear passenger later identified as JEREMIE REYES-GONZALEZ,[21] and an unknown Hispanic female front passenger.

84.     According to UC-3, NAVARRETE handed REYES-GONZALEZ a clear plastic bag of suspected cocaine, and REYES-GONZALEZ then handed the suspected cocaine to UC-3. UC-3 handed $400 to REYES-GONZALEZ, who then handed the money to NAVARRETE.

85.     The DEA North Central Laboratory tested the suspected cocaine NAVARRETE and REYES-GONZALEZ provided to UC-3 on June 19, 2025, and it consisted of 13.9 grams of cocaine.

### D.     COUNT FOUR: ALEXIS GUTIERREZ Possessed with Intent to Distribute Cocaine on November 14, 2025

86.     The conduct relating to GUTIERREZ's possession with intent to distribute cocaine on November 14, 2025, as charged in Count Four of the Complaint, is described in paragraphs 18 to 26 above.

### E.     COUNT FIVE: ANDRADE, RUBIO, and ALEXIS ANDRADE Possessed with Intent to Distribute 500 Grams of More of Cocaine on November 16, 2025; and

### COUNT SIX: RUBIO and ALEXIS ANDRADE Possessed a Firearm in Furtherance of a Drug Trafficking Crime, namely,

---

[20] On July 2, 2025, a CPD officer searched a law enforcement database for the red Jeep Wrangler and learned that CPD stopped the vehicle on June 18, 2025, for expired registration and identified the driver as NAVARRETE. NAVARRETE's Illinois driver's license photo matched the description of one of the individuals who sold cocaine to UC-3 on June 19, 2025, and UC-3 picked NAVARRETE out of a photo line-up.

[21] REYES-GONZALEZ was the passenger in NAVARRETE's Jeep Wrangler during the above-referenced CPD traffic stop on June 18, 2025. Officers identified REYES-GONZALEZ during the traffic stop and UC-3 later picked REYES-GONZALEZ out of a photo line-up as one of the individuals who sold cocaine to UC-3 on June 19, 2025.

**Possession with Intent to Distribute Cocaine on November 16, 2025, as Charged in Count Five of this Complaint**

87. On November 8, 2025, ANDRADE arranged a narcotics transaction with Individual B and Individual C. ANDRADE directed RICHARD RUBIO to meet with Individuals B and C.

88. At approximately 6:00 p.m., Title III intercept session 3782 captured an outgoing call from ANDRADE to telephone number (XXX) XXX-3522, used by RUBIO,[22] and they engaged in the following conversation:

ANDRADE:     "What car you in?"

RUBIO:     "I'm in your truck."[23]

89. At approximately 6:31 p.m., ANDRADE began exchanging text messages with (XXX) XXX-6236, a phone number used by one or both Individuals B

---

[22] Agents identified the male speaker as RICHARD RUBIO because ANDRADE addressed the male as "Richard," "Rich," or "Richie" across multiple calls intercepted by law enforcement. According to subscriber information, this number is registered to RUBIO. Additionally, law enforcement saw an individual matching Illinois driver's license and previous arrests photos of RUBIO drive a previously observed Chevrolet Trax later this same day to ANDRADE's residence, as discussed below, after the user of (XXX) XXX-3522 told ANDRADE that he was driving the Trax.

[23] As noted below, law enforcement saw RUBIO driving the black Chevrolet Trax, which is registered to RUBIO but frequently driven by ANDRADE.

and C.[24] ANDRADE communicated via text with Individual B and/or C's phone at the following times:[25]

Two incoming texts at 6:31 p.m.

One outgoing text at 6:31 p.m.

One incoming text at 6:31 p.m.

Two incoming texts at 6:47 p.m.

One outgoing text at 6:47 p.m.

One incoming text at 6:47 p.m.

One outgoing text at 6:47 p.m.

One outgoing text at 6:51 p.m.

Three incoming texts at 7:03 p.m.

90.    Based on the subsequent calls between ANDRADE and RUBIO, the subsequent surveillance conducted, and the traffic stop of Individuals B and C (detailed below in paragraphs 91 to 97), I believe that during the text messages

---

[24] Law enforcement does not currently know which specific individual is the user of this phone number, or if both Individual B and Individual C use the phone. Law enforcement determined that the phone number is associated with the Individuals B and C, who are brothers, because the brothers arrived to conduct a narcotics transaction on two separate occasions, both of which coincide with text messages between Individual B and/or C's phone and ANDRADE's Phone. For example, on November 16, 2025, as detailed in paragraph 99 below, the user of Individual B and/or C's phone sent two text messages to ANDRADE's Phone. Law enforcement then saw Individuals B and C arrive at the Pete's Fresh Market in a silver 2007 Toyota sedan at approximately 2:35 p.m. ALEXIS ANDRADE and RUBIO then robbed Individuals B and C of five kilograms in an adjacent parking lot at approximately 3:21 p.m.

[25] The content of the text messages was not obtained because agents did not have authorization to intercept electronic communications over ANDRADE's Phone at this time.

between 6:31 p.m. and 7:03 p.m., ANDRADE and Individual B and/or C discussed Individual B and/or C providing cocaine to RUBIO.

91. At approximately 6:49 p.m., Title III intercept session 3967 captured an outgoing call from ANDRADE to RUBIO, and they engaged in the following conversation:

| ANDRADE: | "There's a paisa pulling up, he might give you something [drugs] right now. Give him the money." |
| RUBIO: | "He's gonna give me something?" |
| ANDRADE: | "He might give you something. If they give you something come bring it to me." |
| RUBIO: | "I wanna try it." |
| ANDRADE: | "[unintelligible] you could." |
| RUBIO: | "Nah, what is it bitch, it better be the other shit, it better be coke [cocaine]." |

[ANDRADE and RUBIO both laugh, and the call ends shortly after.]

92. Based on my training and experience, I believe ANDRADE and RUBIO were discussing a narcotics transaction. ANDRADE directed RUBIO to receive narcotics from an unknown male and pay that unknown male. Based on RUBIO's statement "it better be the other shit, it better be coke," I believe RUBIO thought a narcotic other than cocaine might be delivered.

93. At approximately 6:50 p.m., Title III intercept session 3971 captured an outgoing call from ANDRADE to RUBIO, and they engaged in the following conversation:

| RUBIO: | "Is he in a grey Toyota? Silver?" |

ANDRADE:      "Probably, he with a girl?"

RUBIO:      "No, there's another dude in there."

...

RUBIO:      "An older paisa and a younger one."

[RUBIO can be heard talking to an unknown male in the background and telling the unknown male he (RUBIO) has his baby with him.]

ANDRADE:      "You gave him something?"

RUBIO:      "I gave him the money, yeah."

ANDRADE:      "He gave you something?"

RUBIO:      "Yeah."

ANDRADE:      "Well bring it."

RUBIO:      "What do I do with the 8-ball [1/8 of 1 ounce], the coke [cocaine] I got?"

...

ANDRADE:      "Toss that bitch over the fence, hurry up, my son's in the back right now."

94.    Based on my training and experience, I believe ANDRADE and RUBIO were coordinating the narcotics transaction, both before it occurred and during the transaction. During the call, RUBIO can be heard talking to an unknown male in the background. Based on the context of the call and surveillance observations at the time, I believe that unknown male was Individual B. During the call, I believe RUBIO confirmed that he gave money to Individuals B and C and that he received cocaine

from Individuals B and C. ANDRADE told RUBIO to throw the cocaine over the fence at ANDRADE's Residence so ANDRADE's son could retrieve it.

95.     At approximately 6:49 p.m., surveillance officers observed a silver Toyota sedan[26] and the previously observed Chevrolet Trax park within several spaces of each other in the Pete's Fresh Market parking lot. Individual B[27] exited the Toyota, approached the driver's window of the Chevrolet Trax, and spoke with the driver. The two exchanged items before Individual B re-entered the front passenger seat of the Toyota. Both vehicles departed shortly after.

96.     At approximately 6:53 p.m., according to the live feed from a pole camera in front of ANDRADE's Residence, RUBIO drove the Chevrolet Trax to the front of the residence and threw a small package over the fence. Based on my training and experience, and discussions with other law enforcement officers, I believe the package contained the narcotics ANDRADE instructed RUBIO to purchase from Individuals B and C. An unknown male, believed to be one of ANDRADE's minor sons, retrieved the package.

97.     Surveillance officers followed the silver Toyota when it departed the Pete's Fresh Market parking lot. CPD conducted an investigatory traffic stop on the Toyota and identified the two males inside the vehicle as Individual B and Individual C.

---

[26] According to Illinois Secretary of State records, the silver 2007 Toyota sedan, is registered to Individual C.

[27] As described below, law enforcement identified Individual B during a traffic stop later that day.

98.     On November 16, 2025, at approximately 1:17 p.m., Title III intercept session 6638 captured an outgoing call from ANDRADE to RUBIO. During the call, ANDRADE stated, "Be on point just in case if I need ya we're gonna rob this paisa." RUBIO responded, "[UI] I'm waiting, I'm going," and ANDRADE continued, "I'm trying to wait for this call to…[UI]…so be on point." RUBIO ended the call stating, "I gotta wash clothes anyway so fuck it." Based on my training, experience, and knowledge of this investigation, I believe ANDRADE was recruiting RUBIO to participate in a robbery and to be ready for ANDRADE to send him somewhere. I believe RUBIO's statement "I gotta wash clothes anyway so fuck it," was a nonchalant agreement that he would take part in the robbery, essentially saying he could do it because he needed to go out anyway.

99.     At approximately 2:04 p.m., ANDRADE received two incoming text messages from Individual B and/or C's phone.

100.    At approximately 2:30 p.m., Title III intercept session 6662 captured an outgoing call from ANDRADE to RUBIO, and they engaged in the following conversation:

| | |
|---|---|
| ANDRADE: | "Where you at?" |
| RUBIO: | "I'm right here on Cal and 47th…uh, 48th." |
| ANDRADE: | "I told you a fuckin' hour dog, you said you was gonna be around the fuckin' neighborhood!" |
| RUBIO: | "I'm not that far, I took a little ride over here…I was waiting." |
| ANDRADE: | "Hey Richard, this is not the time to play with me, bro." |

41

RUBIO:              "Ok, I'm going."

ANDRADE:            "Hurry the fuck up, bro."

101.    Based on my training, experience, and knowledge of this investigation, I believe ANDRADE was checking on RUBIO's location as he set up the robbery and was angry because RUBIO was not nearby as directed.

102.    At approximately 3:23 p.m., Title III intercept session 6727 captured an incoming call to ANDRADE from telephone number (XXX) XXX-7736, used by ALEXIS ANDRADE.[28] ANDRADE and ALEXIS ANDRADE engaged in the following conversation:

ANDRADE:            "Hello?"

ALEXIS ANDRADE:     [Speaking to person in background]: "Take off, take off!" [Speaking to ANDRADE]: "Hey gang it was a setup, I told you."

ANDRADE:            "What you mean?"

ALEXIS ANDRADE:     "5-0 [police] nigga, there's like 10 squad cars gang...they chasin' us gang."

103.    Based on my training, experience, and knowledge of this investigation, I believe ALEXIS ANDRADE was telling ANDRADE he believed law enforcement knew about the narcotics deal/robbery before it happened and was waiting to stop

---

[28] Agents identified the male speaker as ALEXIS ANDRADE because ANDRADE directed the male to the area around ANDRADE's Residence prior to the November 16, 2025 robbery and surveillance observed ALEXIS ANDRADE driving in the vicinity of ANDRADE's Residence at that time. As detailed below, CPD arrested ALEXIS ANDRADE on November 16, 2025. Additionally, according to subscriber information, this number is registered to ALEXIS ANDRADE.

their car, because multiple law enforcement vehicles began pursuing the ALEXIS
ANDRADE's car shortly after the robbery.

104.    At approximately 5:23 p.m., Title III intercept session 6802 captured an
outgoing call from ANDRADE to telephone number (XXX) XXX-0778, used by
Individual E.[29] ANDRADE and Individual E engaged in the following conversation:

> ANDRADE:        "This was how it was supposed to go, they was supposed to
> come up on a paisa, they was gonna rob a paisa and shit
> like that…for like five bricks [kilograms of cocaine] 'cause
> I had given 'em a tip."
>
> Individual E:   "Um hmm."
>
> ANDRADE:        "I don't know what happened…they took the bricks from
> dude, as soon as they took off, I don't know if they ran a red
> light, or they were speeding, supposedly the police got
> behind them and they were tossing shit out the window,
> you know?"
>
> Individual E:   "Yeah."
>
> ANDRADE:        "From then on I haven't heard from them niggas."

ANDRADE and Individual E then discussed retrieving ALEXIS ANDRADE's car
from the parking lot of the Currency Exchange.[30]

> ANDRADE:        "I just hope they don't get caught with the bricks
> [kilograms of cocaine], it was like 5, 6 bricks, ya know?"

---

[29] Agents identified the female speaker as Individual E, ALEXIS ANDRADE's live-in
girlfriend, based on context from intercepted calls between Individual E and ANDRADE.
Additionally, subscriber records show that this number is registered to Individual E.

[30] ALEXIS ANDRADE left his vehicle in the parking lot of the New Fairfield Currency
Exchange, located at 2560 W. Cermak Road, Chicago, Illinois. This address is approximately
one block from ANDRADE's Residence.

| Individual E: | "This nigga told me your brother was gonna go too, Gunner[31]...was he there?" |
| ANDRADE: | "Gunner was there too...Gunner was in the other car watchin' them." |
| ANDRADE: | "...look, it's Gunner, Wedo, and Richard my neutron homie, he's the driver, he got the chopper on him, he got the ARP on him, you know? Wedo had the 30 popper on him...it was the easiest lick [robbery], they did it right. He hopped right in, they robbed the paisa, they took off." |
| Individual E: | "Who drove though?" |
| ANDRADE: | "Richard. Wedo was in the back seat." |

105. Based on my training, experience, and knowledge of the investigation, I believe ANDRADE described the robbery plan to Individual E. I know that "lick" is a commonly used term for robbery. Specifically, ANDRADE told Individual E that he sent RUBIO (i.e., "Richard"), ALEXIS ANDRADE (i.e., "Wedo"),[32] and Individual A (i.e., "Gunner") to rob Individual B and Individual C of 5 or 6 "bricks" of narcotics. ANDRADE also described the guns that were possessed during the robbery when he described the "chopper," the "ARP," and the "30 popper."

106. At approximately 2:35 p.m. (i.e., approximately 3 hours before the call between ANDRADE and Individual E described above), surveillance officers observed Individual B and Individual C arrive in the same silver Toyota sedan that they had been stopped in by law enforcement on November 8, 2025, as described above.

---

[31] According to CPD reports and/or databases, "Gunner" is the nickname for Individual A, who is ANDRADE's brother.

[32] Throughout the conversation, ANDRADE referred to ALEXIS ANDRADE as "Wedo," which, according to a CPD database, is a nickname for ALEXIS ANDRADE. As noted above, "Wedo" is also a nickname for ANDRADE. ALEXIS ANDRADE is ANDRADE's cousin.

Individuals B and C entered Pete's Fresh Market and, according to store surveillance video, both Individuals B and C entered and exited the store. Surveillance officers observed RUBIO and ALEXIS ANDRADE in a Mazda sedan, parked on the south side of Cermak in a shopping center parking lot. Surveillance officers also observed Individual A in a gray Honda Accord[33] parked outside a currency exchange on the north side of Cermak at the intersection of Cermak and Rockwell. At approximately 3:21 p.m., agents observed Individual B remove a box from the vehicle occupied by Individuals B and C, place the box in the trunk of the Mazda sedan driven by RUBIO, and subsequently get shoved out of the Mazda when Individual B attempted to enter the front passenger seat. The Mazda then drove off.

107. Shortly thereafter, officers attempted to conduct a traffic stop on the Mazda, but the Mazda fled from officers. During the pursuit, two firearms were thrown from the Mazda and later recovered by officers. The two firearms were one Glock 17 9mm semi-automatic pistol bearing serial number BVSL666 and one black semi-automatic 7.62x39mm pistol bearing no serial number, which I believe were the "30-popper" and "ARP" referenced by ANDRADE during his call with Individual E. In my training and experience, I know the term "ARP" is commonly used to refer to an AR pistol, which is a pistol chambered in a rifle-caliber round, such as the 7.62x39mm pistol referenced above. I believe that ANDRADE's reference to a "30-popper" refers to a 30-round magazine and I know that there are Glock magazines

---

[33] According to Illinois Secretary of State records, the gray Honda Accord is registered to Individual A.

capable of holding 30 rounds of ammunition. There was no Glock magazine recovered from the scene. At the time the Glock was thrown from the Mazda, the vehicle was traveling at a high rate of speed, and I know that it is possible for a magazine to become detached from a firearm in such a scenario given that no magazine was recovered from the scene. The 7.62x39mm pistol, which was also thrown from the Mazda, had a magazine which detached from the firearm but was recovered by law enforcement.

108.    The Mazda crashed and arresting officers removed RUBIO from the driver's seat and ALEXIS ANDRADE from the rear passenger seat of the Mazda. Officers observed five bundles of suspected cocaine wrapped in blue and white tape in a grassy area adjacent to the crashed Mazda. The suspected cocaine was spilling out of the box that surveillance officers had observed Individual B place into the trunk of the Mazda, as described above.[34] Officers also observed that the rear window of the crashed Mazda, near where ALEXIS ANDRADE had been sitting, was rolled down.

109.    The suspected cocaine found next to the Mazda was field tested and tested positive for the presence of cocaine. It weighed 5,000 gross grams, including packaging.

110.    At approximately 3:30 p.m., agents watching a live feed from the pole camera in the alley behind ANDRADE's Residence saw Individual A arrive in the gray Honda Accord, exit the vehicle, and hand an object that appeared to be a pistol

---

[34] The Mazda 6 is a vehicle where the trunk is accessible from the passenger compartment.

to MORA-HERNANDEZ. MORA-HERNANDEZ then took the object that appeared to be a pistol inside ANDRADE's Residence and Individual A departed.

### F. COUNT SEVEN: ANDRADE and JEREMY RUSH Distributed Cocaine to UC-3 on November 21, 2025.

111.  On November 21, 2025, at approximately 5:47 p.m., UC-3 called ANDRADE. During the call, UC-3 told ANDRADE he/she was in the Addison, Illinois area, and wanted to purchase 1.5 ounces of cocaine. UC-3 told ANDRADE that he/she was located at the Portillo's restaurant located at 100 East Lake Street, Addison, Illinois (the "Portillo's"). UC-3 and ANDRADE engaged in the following conversation (in Spanish and English, translated to English):

| ANDRADE: | "What's up?" |
|---|---|
| UC-3: | "Hey, I was going to tell you, uh I'm over by…I'm just getting off work. I'm over here by Addison. Um, do you have someone over here who can bring me a one and a half [ounces of cocaine]?" |
| ANDRADE: | "Yes. I got, I got somebody over there." |
| UC-3: | "Alright. Hey, I was short last time. They just gave me nine [grams of cocaine]." |
| ANDRADE: | "What the fuck, for real?" |
| UC-3: | "Yes, for real. You know how I am." |
| ANDRADE: | "No, yeah. I mean, yeah. I can't…you know? I mean, that's cause I'm staying here, dog. Let me, uh…let me call my guy and see. Where at in Addison? Send me the address." |
| UC-3: | "Right here, I'm right here by…I'll be by the Portillo's in a little bit." |

ANDRADE: "Oh, you're close, you're close to my homie's crib. He stays on 1XX Lincoln Avenue right there in Addison, dog. Five minutes away. Let me call him, let me call him."

UC-3: "1XX and what?"

ANDRADE: "Uh, 1XX Lincoln Avenue."

UC-3: "Oh, alright. Alright, well call me back and let me know."

112. Based on my training, experience, and knowledge of the investigation, I believe ANDRADE was directing UC-3 to the residence located at 1XX Lincoln Avenue in Addison, Illinois.[35] I believe ANDRADE planned to call RUSH to coordinate the deal after completing the call with UC-3.

113. At approximately 6:18 p.m., surveillance officers observed a black male later identified as JEREMY RUSH[36] exit 1XXB South Lincoln Avenue, an apartment building located in Addison, Illinois, and enter the front passenger seat of a black Dodge Charger[37] that then departed the area. At approximately 6:28 p.m., the black Dodge Charger returned to the apartment building parking lot and RUSH exited the Charger and entered the apartment building at 1XXB South Lincoln Avenue.

114. At approximately 6:36 p.m., ANDRADE called UC-3 to continue the arrangement of the narcotics transaction and engaged in the following conversation (in Spanish and English, translated to English):

---

[35] According to Illinois Secretary of State records, 1XX Lincoln Avenue in Addison, Illinois is listed as JEREMY RUSH's address on his Illinois identification card.

[36] On November 25, 2025, UC-3 identified JEREMY RUSH from a photo lineup as the individual who sold him/her cocaine on November 21, 2025.

[37] According to Illinois Secretary of State records. the black Dodge Charger is registered to an individual with an address on South Oakley Avenue in Chicago, Illinois.

| ANDRADE: | "Hey, what kind of car...are you in front of the house, right? What kind of car you in?" |
| UC-3: | "I'm in front in a black car. I have the lights on, they're dim" |
| ANDRADE: | "Ok, my friend is black. He's uh...he's black. So when he comes out of the house, you can see him, he's black. |
| UC-3: | "Ok, that's fine dude." |

115.   At approximately 6:37 p.m., RUSH exited the apartment building and approached UC-3's vehicle. At the driver's window, RUSH asked UC-3 if he/she knew "Wedo" (i.e., ANDRADE) and then handed UC-3 a clear plastic ziplock bag containing suspected cocaine. UC-3 handed RUSH $900. RUSH then returned to the apartment building while UC-3 departed the area.

116.   UC-3 observed the bag of suspected cocaine seemed smaller than expected and weighed the suspected cocaine with a digital scale in UC-3's car. The suspected cocaine weighed approximately 15.5 grams, including packaging, not the expected 42 grams (or, 1.5 ounces), that UC-3 ordered and paid for. UC-3 called ANDRADE and engaged in the following conversation:

| ANDRADE: | "Yeah, uh, hello." |
| UC-3: | "What's up? Look, I'm short. He only gave me fifteen [grams of cocaine]." |
| ANDRADE: | "What do you want?" |
| UC-3: | "I wanted an ounce and a half [of cocaine]." |
| ANDRADE: | "Ok, ok, ok." |

117.     Based on my training, experience, and knowledge of the investigation, I believe UC-3 called ANDRADE to let ANDRADE know he paid for 1.5 ounces of cocaine and only received less than one-half ounce. Because UC-3 had no means to communicate with RUSH, ANDRADE had to coordinate with RUSH to fix the issue.

118.     At approximately 6:44 p.m., ANDRADE called UC-3 and had the following conversation (in Spanish and English, translated to English):

ANDRADE:      "You're still there, right?"

UC-3:         "Yes, I'm right here around the corner."

ANDRADE:      "Ok, yeah, yeah, yeah. Go back in front, dog."

UC-3:         "Alright. So I'm missing the ounce [of cocaine], right?"

ANDRADE:      "Yeah yeah yeah. It's my fault 'cause I thought you said a half ounce [of cocaine]. That's my fault."

UC-3:         "No, no, one and a half [ounces of cocaine]. I'll be right there."

ANDRADE:      "Ok, bye."

119.     Based on my training, experience, and knowledge of the investigation, I believe ANDRADE was instructing UC-3 to meet with RUSH again so RUSH could provide UC-3 with the additional cocaine that UC-3 had paid for. I believe ANDRADE also apologized to UC-3 for the problem conducting the transaction.

120.     After returning to the apartment building at 1XXB South Lincoln Avenue at approximately 6:47 p.m., UC-3 observed RUSH exit the building and approach UC-3's vehicle. RUSH was holding a clear ziplock bag containing suspected

cocaine, which he handed to UC-3 and apologized for the misunderstanding. After the exchange and brief conversation, UC-3 departed the area.

121. The suspected cocaine RUSH sold to UC-3 field tested positive for the presence of cocaine and weighed approximately 45.1 gross grams, including packaging.

### G. COUNT EIGHT: ANDRADE and JEREMY RUSH Distributed Cocaine to UC-3 on December 19, 2025.

122. On December 19, 2025, at approximately 5:00 pm., Title III intercept session 13055 captured an incoming call to ANDRADE from UC-3, and they engaged in conversation in Spanish and English, which was translated to English. UC-3 stated that he/she was near the Portillo's in Addison again and requested "two [ounces of cocaine] if it's possible." ANDRADE responded, "two ounces [of cocaine]" and UC-3 confirmed. ANDRADE responded, "I got you bro." UC-3 asked ANDRADE if he/she should go to the same place as the previous deal on November 21, 2025, but ANDRADE responded no, ANDRADE would send UC-3 to a different location.

123. At approximately 5:07pm, the Title III intercept captured an outgoing text message from ANDRADE to UC-3 that said, "5XX w division Villa park." UC-3 responded asking ANDRADE if he/she was to again meet RUSH at this new location by saying, "is that your friend the black guy?" ANDRADE confirmed that UC-3 would be meeting with the same person that UC-3 had previously met. At approximately 5:50 p.m., UC-3 called ANDRADE and told ANDRADE that UC-3 was at the address in a black car.

124.    At approximately 5:58 p.m., surveillance officers observed RUSH exit from the vicinity of the residence at 5XX West Division St. in Villa Park, Illinois, which is a multi-unit apartment building, and walk down the driveway while speaking on the phone in a manner that appeared to be either a video call or speakerphone. RUSH then approached UC-3's vehicle and stood near the driver's window. UC-3 provided RUSH with $1,200 and RUSH gave UC-3 a clear, zip-top plastic bag containing suspected cocaine. RUSH then returned to the residence.[38]

125.    The substance UC-3 received from RUSH field tested positive for the presence of cocaine and weighed approximately 58.5 gross grams, including packaging.

> **H. COUNT NINE:** ANDRADE and MORA-HERNANDEZ Possessed with Intent to Distribute Cocaine on December 23, 2025; and
>
> **COUNT TEN:** ANDRADE and MORA-HERNANDEZ Possessed a Firearm in Furtherance of a Drug Trafficking Crime, namely, Possession with Intent to Distribute Cocaine, as Charged in Count Nine, on December 23, 2025

126.    The conduct related to ANDRADE and MORA-HERNANDEZ possessing with intent to distribute cocaine and possessing a firearm in furtherance of a drug trafficking crime, as charged in Counts 9 and 10 of the Complaint, is described in paragraphs 50 to 69 above.

---

[38] UC-3 confirmed that the individual who sold him/her cocaine on this date was the same individual who sold him/her cocaine on November 21, 2025. Since the December 19, 2025 controlled purchase, law enforcement has confirmed that RUSH currently resides at 5XX W. Division, Unit 3 St. in Villa Park, Illinois. Law enforcement has observed RUSH enter and exit the apartment building at 5XX W. Division on multiple dates since December 19, 2025 and specifically observe Rush enter and/or exit Unit 3 on January 27, 2025.

## IV.    Conclusion

127.    Based on the foregoing, it is your Affiant's belief that there is probable cause to believe JOEL ANDRADE (a.k.a. "Wedo"), MARIA BRENDA MORA-HERNANDEZ, RICHARD RUBIO, ALEXIS ANDRADE, JEREMY RUSH (a.k.a. "Slim"), DEVONTE JONES, JOSE NAVARRETE, JEREMIE REYES-GONZALEZ, and ALEXIS GUTIERREZ committed the offenses as alleged in the Complaint.

FURTHER AFFIANT SAYETH NOT.

_George E. Hobbs_
_____
GEORGE E. HOBBS
Special Agent, Federal Bureau of
Investigation

SWORN TO AND AFFIRMED by telephone January 28, 2026.    11:11 pm

_Beth W. Jantz_
_____
Honorable Beth W. Jantz
United States Magistrate Judge